UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>LUIS MARTIN ORTIZ,<br><br>　　　　Defendant.<br>_____/ | No. CR-14-0019 EMC<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS**<br><br>**(Docket No. 12)** |

　　　　Defendant Luis Martin Ortiz has moved the Court to suppress evidence obtained through a search of his person and vehicle conducted on October 21, 2013. Motion to Suppress ("Motion"), Docket No. 12. The Government opposes the Motion. Government's Response to Defendant's Motion to Suppress ("Response"), Docket No. 15. On July 30, 2014, the Court held an evidentiary hearing to resolve factual disputes as to whether Ortiz consented to the search of his vehicle, and whether reasonable suspicion supported the prolongation of a traffic stop and subsequent frisk of Ortiz. Minute Order, Docket No. 19. The day before the hearing, the City of Ukiah Police Department ("UPD"), joined by the Government, filed a Motion to Quash a subpoena Ortiz had served on the UPD four days earlier. Docket No. 26. The subpoena requested information from the personnel files of three officers who were present at various times during the searches.

　　　　Having considered the parties' briefs and accompanying submissions, as well as testimony, the witnesses' demeanor, and arguments presented at the evidentiary hearing, the Court hereby **GRANTS** Ortiz's Motion to Suppress and the UPD's Motion to Quash.

# I. FACTUAL BACKGROUND

The testimony of Pintane and Ortiz during the evidentiary hearing largely coincided with their declarations, the police report and briefs filed in conjunction with the Motion to Suppress. The testimony however clarified some points and provided a few additional facts, as noted below.

A.   The Initial Traffic Stop

At approximately 10:00 p.m. on October 21, 2013, Ortiz was driving his truck with only his parking lights on, and headlights off, a violation of the California Vehicle Code. UPD Report ("UPD Rpt."), Docket No. 12-1, 3; Declaration of Luis Ortiz ("Ortiz Decl."), Docket No. 12-2, ¶ 2. Pintane, a sergeant with the UPD for fifteen years, called in Ortiz's truck and activated his overhead lights. Declaration of Richard Pintane ("Pintane Decl."), Docket No. 16, ¶ 1; UPD Rpt. at 3. Ortiz drove about 500 feet and pulled into a gas station, stopping between two pumps. *See* Defendant's Reply Memorandum in Support ("Reply"), Docket No. 18, 7:12-13; UPD Rpt. at 3; Ortiz Decl. ¶ 4; Motion at 4 n. 2.

Pintane approached Ortiz's truck and explained the reason for the stop. UPD Rpt. at 3; Ortiz Decl. ¶ 5. Ortiz laughed that his headlights were turned off and turned them on.[1] UPD Rpt. at 3; Ortiz Decl. ¶ 5. Ortiz then asked if he could move his vehicle. UPD Rpt. at 3; Ortiz Decl. ¶ 7. During the evidentiary hearing, Ortiz testified that in response to his request Pintane put one finger up to indicate that Ortiz should wait while Pintane listened to communication over his radio. The Government did not dispute this specific testimony. Ortiz further testified he told Pintane he wanted to move his truck closer to the pump so he could pump gas. But Pintane testified Ortiz did not mention wanting to pump gas, and that he believed Ortiz may have wanted to park the truck intending to leave it.

Ortiz asked for Pintane's registration and proof of insurance. UPD Rpt. at 3. Ortiz explained that the insurance card would not reflect the present vehicle, as his truck was new. *Id.*; Ortiz Decl. ¶ 5. Pintane testified that Ortiz became nervous when asked for the paperwork and that Ortiz's hand shook as Ortiz retrieved the paperwork from the glove box and handed it to Pintane. Pintane

---

[1] According to the UPD report, Pintane noticed that Ortiz had several "prison style tattoos" on his left forearm, though he "could not tell what they were of." UPD Rpt. at 3.

2

Testimony. While Pintane reviewed the paperwork, Ortiz dropped his hands. UPD Rpt. at 3. Pintane asked Ortiz to keep his hands where he could see them. *Id.*; Ortiz Decl. ¶ 6. Ortiz complied, but "lowered them again shortly thereafter[,]" and Pintane asked him to place them on the steering wheel. UPD Rpt. at 3.

Pintane then called UPD dispatch to check Ortiz's license status and for any outstanding warrants or supervised release. *Id.* Pintane noted again that Ortiz was nervous and asked a second time if he could move the truck. *Id.* at 4. Pintane refused and told Ortiz to keep his hands on the wheel. UPD Rpt. at 4; Ortiz Decl. ¶ 7. UPD dispatch "advised Ortiz had a valid license and was not on probation/parole or on any type of supervised release." UPD Rpt. at 4.

B.  Continued Stop: Consent

After the check came back clear, Pintane called for a second unit and proceeded to ask Ortiz further questions. *Id.*

1.  Pintane's Version of the Facts

According to Pintane, he asked if Ortiz had anything illegal in the truck. *Id.* "Ortiz hesitated [and] looked around the vehicle" before saying no. *Id.* Pintane then asked Ortiz if he could search the vehicle and "Ortiz hesitated, looked around[, and] stated, 'Go ahead.'" *Id.* When Ortiz stayed in the truck, Pintane told Ortiz that he "could not search the vehicle with him in [sic] seated in the driver seat." *Id.* Ortiz responded "Oh," opening the door and stepping out, and Pintane asked Ortiz whether there was anything Pintane should be concerned about, to which Ortiz replied, "there might be some bullets." *Id.*

2.  Ortiz's Version of the Facts

On the other hand, Ortiz explained that he responded to the request to search his car by saying, "Why? I'm not on parole or probation." Ortiz Decl. ¶ 8. Then, Pintane told Ortiz if he did not "have anything illegal in the truck, [he] should have nothing to hide." *Id.* Ortiz replied, "well, you have no reason to search me if I'm not on parole or probation." *Id.* At that point, Pintane said, "sir, would you please step out of the truck," and Ortiz complied. *Id.* Ortiz contends that he mentioned a necklace made out of a bullet, but did not otherwise mention bullets in the car. Motion at 13.

3

C.  Continued Stop:  Frisk and Arrest

Pintane held Ortiz's hands behind Ortiz's back, beginning a frisk with his free hand. UPD Rpt. at 4; Ortiz Decl. ¶ 9. Pintane then "grabbed" Ortiz's clothing "on the front of his body at the waistline" in search of a handgun. UPD Rpt. at 4. During the evidentiary hearing, Pintane testified that Ortiz wore a "baggy" shirt and what he believed to be denim pants. He explained that the folds in the shirt's material made it difficult for him to be certain that Ortiz was not concealing a weapon. Pintane Testimony. Ortiz, on the other hand, testified that he had been wearing a tee shirt, which he explained to the Court was very similar to the one he was wearing at the hearing. The shirt that he showed the Court at the end of the evidentiary hearing was made of a thin, cotton-like material. The Government did not dispute this testimony. Pintane stated Ortiz watched him closely while he conducted the frisk.

Pintane did not feel anything during the frisk. UPD Rpt. at 4. He then lifted Ortiz's shirt up "exposing his waistline, the top of his pants," and "the tail end of . . . a torn piece of a clear plastic bag." *Id.* Pintane states that based on his "training and experience that drugs, specifically methamphetamine, are often packaged in this manner (placed in the corner of a plastic baggie, then torn off and tied into a knot) and that people do carry drugs down their pants in an attempt to conceal them," he believed what he "had seen was drugs." *Id.* at 4-5.

Pintane "initially acted as though [he] did not see the packaging as [he] was alone, Ortiz was much larger than [him,] and he still believed a firearm was present." *Id.* at 5. He "lowered [Ortiz's] shirt and called for the responding unit to speed up their response." *Id.* Pintane handcuffed Ortiz without incident. *Id.*

Once Officer Covella arrived to assist, Pintane removed the baggie under Ortiz's shirt containing "a quantity of white crystalline substance, which [Pintane] suspected was methamphetamine." *Id.* Ortiz was put under arrest. Pintane Decl. ¶ 4. Twelve minutes elapsed between the time Pintane first called in the incident to dispatch and the arrest. *Id.*

D.  Search of Ortiz and Truck Incident to Arrest

Pintane "searched Ortiz's person incident to arrest, [and] in one of his pant pockets [found] a [similar] small gray plastic baggie," which he suspected contained methamphetamine. UPD Rpt. at

4

4. Officer Phillips arrived to assist, and Pintane secured Ortiz in the back of his patrol vehicle. *Id.* The officers searched the truck, finding a handgun, ammunition and other gun-related paraphernalia, a digital scale, a stun gun, and a zippered bag containing "a glass meth pipe, a small piece of yellow sponge, a small, round plastic container and two large bundles of suspected methamphetamine packaged in two separate plastic baggies." *Id.*

The officers then had Ortiz's truck towed and transported Ortiz to the UPD. *Id.* Pintane called in the handgun's serial number and discovered that it had been reported as stolen. *Id.* Ortiz's criminal history showed that he was a convicted felon, had been sentenced to prison, and was prohibited from possessing a firearm or ammunition. *Id.*

## II. DISCUSSION

A. Motion to Quash

Ortiz requested through subpoena personnel file information for officers Pintane, Covella and Phillips, apparently to use for impeachment purposes during the evidentiary hearing.[2] *See* Docket No. 27, Exh. A. The subpoena requested:

> Personnel file information including any document that tends to report on the veracity and candor of the officer, any known history of misconduct as law enforcement officer, past instances where the officer's veracity or candor has been called into question, formal or informal reprimands from the Ukiah Police Department, Mendocino County Sheriff's Office, or any other known law enforcement agencies, pending or resolved internal investigations and/or substantiated reports of corruption and/or other improper conduct; citizens' complaints about the officer's conduct; any disciplinary report or report of infraction regarding improper police practice or improper reporting to a court; any negative finding of untruthfulness on the part of the officer, whether reported by a court, a citizen, the Ukiah Police Department or Mendocino County Sheriff's office, or any other entity; allegations and substantiations of any unconstitutional conduct including violations of search and seizure provisions.

Docket No. 26.

The UPD attached to its Motion to Quash, a declaration by Trent Taylor, a captain in the UPD responsible for responding to subpoenas, declaring that the "UPD has no documents in its

---

[2] At the hearing, defense counsel clarified that it was seeking such information only for Pintane, as the other two officers were not testifying at the evidentiary hearing.

5

possession or under its control which are responsive to the description in Exhibit A to the Subpoena for Sergeant Rick Pintane." Docket No. 27.

During the hearing, the parties agreed the subpoena should be directed only to Pintane's records and was not to encompass general personnel matters unrelated to this case. The Court determined this issue would be moot if Taylor's declaration was meant as broadly as it was stated. The Court requested the UPD to clarify whether it had applied selection criteria to determine which documents might be "responsive" to the subpoena and which might not. In response, Trent Taylor filed a declaration stating that Pintane's personnel filed contained "no complaints, sustained or unsustained, made against Sergeant Rick Pintane" and "no finding of adverse credibility or any finding of misconduct against Sergeant Pintane made by the Ukiah Police Department or any court or other tribunal." Docket No. 31.

Taylor's declaration satisfies the Court that Pintane's personnel file contains no information that would impeach his testimony. There is no reason to believe the files contain matters that are arguably relevant to the defense, and thus no *in camera* review was required. Thus, the Court **GRANTS** the UPD's Motion to Quash.

B.   Motion to Suppress

The Government asserts that the search of Ortiz's truck was valid on two independent grounds: first, Ortiz consented to the search of his truck and second, the drugs found on Ortiz gave Pintane probable cause to search the truck. The Court held an evidentiary hearing to resolve factual disputes regarding two issues: whether Ortiz consented to the search of his truck and whether Pintane had reasonable suspicion to prolong the traffic stop and conduct a *Terry* frisk which included searching beneath Ortiz's shirt. Only Pintane and Ortiz testified at the hearing.

The Court finds that Ortiz did not consent, that the frisk was not justified at its inception and that in any event, Pintane exceeded the proper scope of a *Terry* frisk. The need not decide whether the traffic stop was unreasonably prolonged. The Government agrees that absent consent and a proper frisk, there was no constitutional basis to search the truck; the fruits of the frisk provided the probable cause to search the truck. Thus, if the evidence found on Ortiz and in his truck was obtained in violation of Ortiz's Fourth Amendment rights, all evidence must be suppressed as "fruit

of the poisonous tree." *United States v. Crews*, 502 F.3d 1130, 1135 (9th Cir. 2007) (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)) (stating that fruit of the poisonous tree is "evidence seized during an unlawful search [that] cannot constitute proof against the victim of the search").

### 1. Legal Standard

Under the Fourth Amendment, people have the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; *see also United States v. Jones*, 132 S. Ct. 945, 949 (2012). A search within the meaning of the Fourth Amendment occurs when "the [G]overnment intrudes upon an expectation of privacy that society is prepared to consider reasonable." *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1027 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 2855 (2013) (citing *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). An officer seizes a person for Fourth Amendment purposes when he, "through coercion, physical force, or a show of authority, in some way restricts the liberty of [that] person." *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004) (internal quotations and citations omitted). An officer restricts a person's liberty when, taking into consideration "all of the circumstances surrounding the encounter, the police conduct 'would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Id.* (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)).

A search or seizure made "without a warrant . . . [is] *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). Those exceptions include: (1) a search with consent, *Florida v. Jimeno*, 500 U.S. 248, 250-51 (1991) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)); (2) the brief detention of a suspect if an officer has reasonable suspicion to believe that criminal activity is afoot, *United States v. Kincade*, 379 F.3d 813, 852 (9th Cir. 2004); (3) a limited frisk if an officer has reasonable suspicion to believe that a suspect is armed and dangerous, *Terry v. Ohio*, 392 U.S. 1, 27 (1968); and (4) the search of a vehicle with probable cause to believe that evidence of a crime will be found there, *United States v. Ross*, 456 U.S. 798, 823 (1982).

In the case of a warrantless search or seizure, the Government bears the burden of proving, by a preponderance of the evidence, that the "warrantless search or seizure falls within an exception to the warrant requirement[.]" *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001); *see also United States v. Vasey*, 834 F.2d 782, 785 (9th Cir. 1987) ("The [G]overnment must prove the existence of an exception to the Fourth Amendment Warrant Requirement by a preponderance of evidence.").

2. <u>No Consent to Search Vehicle</u>

The Government argues that the evidence found in the truck is admissible because it was found pursuant to a search of the truck with Ortiz's consent. Response at 9:3-4. The Supreme Court has "long approved consensual searches because it is no doubt reasonable for the police to conduct a search once . . . permitted to do so." *Jimeno*, 500 U.S. at 250-51 (citing *Schneckloth*, 412 U.S. at 219); *see also United States v. Comegys*, 504 F. App'x 137, 142-43 (3d Cir. 2012) ("[A] search conducted pursuant to consent is one of the specifically established exceptions to the warrant requirement."). However, "[t]he [G]overnment bears the burden of proving consent." *United States v. Vongxay*, 594 F.3d 1111, 1119 (9th Cir. 2010) (citation omitted).

The parties strongly dispute the facts regarding consent. *See supra* Section I.B. According to Pintane, when he asked Ortiz if he could search the vehicle, "Ortiz hesitated, looked around[, and] stated, 'Go ahead.'" UPD Rpt. at 4. When Ortiz stayed in the truck, Pintane told Ortiz that he "could not search the vehicle with him in [sic] seated in the driver seat." *Id.* Pintane states that Ortiz responded "Oh," opening the door and stepping out . . . ." *Id.* Pintane's testimony at the hearing was consistent with the Report.

On the other hand, Ortiz explained that he responded to the request to search his truck by saying, "Why? I'm not on parole or probation." Ortiz Decl. ¶ 8. Then, Pintane stated that if Ortiz did not "have anything illegal in the truck, [he] should have nothing to hide." *Id.* Ortiz replied, "well, you have no reason to search me if I'm not on parole or probation." *Id.* At that point, Pintane said, "sir, would you please step out of the truck[,]" and Ortiz complied. *Id.* Ortiz's testimony at the hearing was consistent with his declaration. The Government does not dispute that Ortiz's version of the facts, if believed, establishes a lack of consent.

1    The Government has not met its burden of proving consent. The Court finds Ortiz's testimony was credible, at least as credible, if not more so, than Pintane's. In addition to his forthright demeanor, the Court notes Ortiz's testimony accords with common sense and logic. First, the undisputed fact that Ortiz remained in the truck after he purportedly gave consent tends in fact to show that he did not consent. As Pintane himself stated during the hearing, a person permitting an officer to search his vehicle would likely get out of his vehicle once he has given that permission. Second, the Court finds it unlikely that Ortiz would have consented to a search of his truck containing contraband, based on Ortiz's prior experience with law enforcement, which resulted in convictions including for drug possession. He had a strong incentive not to consent, particularly since he was not subject to a parole or probation search.

The Government has failed to meet its burden in proving Ortiz gave consent.

3.  <u>The Court Does Not Decide Whether the Detention Was Unreasonably Prolonged Because Pintane's Frisk of Ortiz Was Unconstitutional</u>

Ortiz argues that the traffic stop was unlawfully prolonged when Pintane began to ask about illegal items in the truck and whether Pintane could search the vehicle, despite the fact that the traffic stop had been concluded and resolved. Ortiz also argues that there was no reasonable suspicion to frisk him, and that the frisk exceeded the constitutionally permissible bounds established in *Terry v. Ohio*, 392 U.S. 1 (1968).

a.  <u>Legal Standard</u>

An "investigatory stop (temporary detention) and frisk (patdown for weapon)" is

> constitutionally permissible if two conditions are met. First, the investigatory stop must be lawful. That requirement is met . . . when the police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense. Second,to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous.

*Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009) (discussing the law established under *Terry*).

> In a traffic-stop setting, the first *Terry* condition – a lawful investigatory stop – is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation. The police need not have, in addition, cause to believe any occupant of the vehicle is involved in criminal activity. To justify a

> patdown of the driver or a passenger during a traffic stop, however, just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous.

*Id.* at 327.

"[A] detention beyond the duration of the initial traffic stop must be supported independently by reasonable suspicion of criminality." *Melendres v. Arpaio*, 695 F.3d 990, 1000 (9th Cir. 2012) (citing *Arizona v. Johnson*, 555 U.S. at 333). The question then arises, when does a lawful traffic stop end and become an unlawful detention? The Supreme Court has held:

> Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave. An officer's inquiries into matters unrelated to the justification for the traffic stop do not convert the encounter into something other than a lawful seizure, so long as the inquiries do not measurably extend the stop's duration.

*Arizona v. Johnson*, 555 U.S. at 333. The Supreme Court has not elaborated upon a standard for determining when a stop's duration is "measurably extend[ed]." The Ninth Circuit has held that even if there is some prolonging beyond that necessary to effect a traffic stop, the court must examine whether the prolonging was reasonable as determined by the "totality of the circumstances." *United States v. Turvin*, 517 F.3d 1097, 1101, 1104 (9th Cir. 2008) (holding that "questioning unrelated to the purpose of the traffic stop and separate from the ticket-writing process that prolongs the duration of the stop" may be "reasonable," and therefore need not be supported by reasonable suspicion).

For a frisk to be constitutionally permissible, "the frisk must be both (1) 'justified at its inception,' and (2) 'confined in scope' to a 'carefully limited search of the outer clothing ... in an attempt to discover weapons which might be used to assault' an officer." *United States v. I.E.V.*, 705 F.3d 430, 432 (9th Cir. 2012) (quoting *Terry* 392 U.S. at 20, 29-30). A frisk is "justified at is inception" if there is reasonable suspicion that the suspect is armed and dangerous. *Id*. at 435. The officer must "set forth the requisite 'specific and articulable facts' such that a 'reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *Id*. at 435 (quoting *Terry*, 392 U.S. at 21, 28). "A search exceeds the proper scope if 'the

incriminating character of [an item is] not immediately apparent' but is discovered 'only as a result of a further search.'" *Id.* at 440 (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 379 (1993)).

b. Application

The Court need not decide whether the initial traffic stop was unreasonably prolonged because it determines that the ensuing frisk of Ortiz violated the Fourth Amendment.

i. The Frisk Was Not Justified at Its Inception

It is a close question whether the frisk was justified at its inception by a reasonable suspicion that Ortiz was armed and dangerous. The Court finds it was not. The Government argued during the hearing and in its papers that the following facts established the requisite reasonable suspicion: (1) Ortiz was first "overly friendly" but became nervous after Pintane asked for Ortiz's paperwork; (2) Ortiz asked at least twice to re-park his vehicle even though it was already parked in a safe location; (3) Ortiz put his hands out of Pintane's sight two or three times despite Pintane's orders that he keep them in Pintane's sight"[3]; and (4) when Pintane asked whether there was anything he should be concerned about before searching the vehicle, Ortiz replied, "there might be some bullets."[4] UPD Rpt. at 4. Pintane testified to all of these facts during the hearing.

Ortiz testified to these events as follows. When Pintane initially told him why he was pulled over, Ortiz "laughed about it" and turned his headlights on. Ortiz asked twice to move his truck closer to the pump so that he could pump gas. The first time, Pintane put up one finger, signaling

---

[3] In his declaration, Pintane states that Ortiz "repeatedly put his hands out of my sight," but during the evidentiary hearing, he testified it was two or three times.

[4] In its papers, the Government also referenced three other factors: (1) Ortiz "was driving at 10:09 [p.m.] in October" with his headlights off; (2) "[a]fter Sergeant Pintane signaled for [Ortiz] to pull over, [Ortiz] failed to stop, 'passing several places where [Ortiz] could have safely yielded[;]'" and (3) Ortiz had what Pintane thought appeared to be "prison tattoos" on his arm. Response at 7:1-14. However, based on Pintane's testimony during the evidentiary hearing, the Court does not believe that Pintane took these facts into his reasonable suspicion consideration. Nor could a reasonable officer have relied on these facts. First, during the hearing, Pintane admitted that driving with one's headlights off is a minor and not unusual traffic violation. Second, Pintane affirmed during the hearing that Ortiz only traveled a "short distance" to the gas station before stopping. Similarly, Ortiz stated that he pulled over within ten to fifteen seconds. Reply at 7:11-18. Finally, when asked about the tattoos during the hearing, Pintane answered that he did not get a clear look at them. He had stated in his report that he could not identify the tattoos when he saw them. UPD Rpt. at 3 (stating that Pintane could not identify the tattoos). Pintane also did not explain during the hearing what he meant by "prison tattoos" or what their presence signified to him.

1  Ortiz to hold on while he listened to communication over his radio. Pintane directed him two to
2  three times to put keep his hands where Pintane could see them. At some point, Ortiz answered his
3  cell phone when it rang, and upon hanging up, as best as he could remember, lowered his hands to
4  wipe them on his lap. Ortiz remembered having a cigarette in his hand, but couldn't say for sure
5  whether he had actually been smoking.[5] Pintane testified that Ortiz had not been smoking. Ortiz
6  contends in the Motion that he mentioned a necklace which was made out of a bullet, but never told
7  Pintane he had bullets (ammunition) in the car. Motion at 13. However, Ortiz did not testify to this
8  during the hearing or include it in his declaration.

9        The first three facts to which the Government points do not provide reasonable suspicion that
10  Ortiz was armed and dangerous. The facts, even if credited, describe at most nervous and fidgety
11  behavior, and the Ninth Circuit has held "mere nervous or fidgety conduct and touching of clothing"
12  is insufficient to justify a *Terry* frisk. *I.E.V.*, 705 F.3d at 438. *See also*, *United States v. McKoy*, 428
13  F.3d 38, 40 (1st Cir. 2005) (summarized parenthetically in *I.E.V.* as, "'[n]ervousness is a common
14  and entirely natural reaction to police presence' and the defendant's gestures in this case, while
15  potentially to hide a weapon, were also consistent with reaching for a driver's license, and thus the
16  Government's proposed standard 'comes too close to allowing an automatic frisk of anyone' the
17  officer stops"); *United States v. Ford,* 333 F.3d 839, 842, 845 (7th Cir.2003) (summarized
18  parenthetically in *I.E.V.* as, "Despite the fact that the defendant 'appeared nervous, looked around,
19  stepped backward and reached for his pocket after he activated [a] metal detector,' the court held
20  this 'was insufficient to create a reasonable suspicion that would justify a protective pat-down.'").
21  The evidence supports that Ortiz's acts were "mere nervous and fidgety behavior."

22        Pintane testified that Ortiz asked to move his truck "two to three times" and Ortiz testified it
23  was twice. Pintane testified that he thought Ortiz might be trying to exit the truck and distance
24  himself from it by leaving it and that this was suspicious behavior. In contrast, Ortiz contends he
25  wanted to fuel up and needed to move closer to the pump. Although Pintane testified that Ortiz

---

[5] In his declaration, Ortiz stated: "After I provided the paperwork the police officer ordered me to put my hands on the steering wheel. I complied, but I was smoking and at some point my hands were taken off the steering wheel." Ortiz Decl. ¶ 6.

1  pulled up "right next to" the gas pump as one would do to pump gas, a photo displayed during the
2  hearing showed that both doors of the truck could be completely opened, with additional space
3  between the two gas pumps on either side. Although there is thus some basis supporting Ortiz's
4  testimony, the Court is puzzled why Ortiz would have chosen to fuel up during the traffic stop.
5  However, the Court finds more puzzling (and less credible) Pintane's explanation that he thought
6  Ortiz intended to leave his truck in an attempt to evade Pintane. If true, this suspicion was based on
7  sheer speculation that made little sense. Further, the first time that Ortiz asked to move his truck,
8  Pintane interrupted and never answered Ortiz's question. The fact that Ortiz asked his question
9  again was not unreasonable, given Pintane did not answer the question the first time. The Court
10 finds, based on its assessment of his demeanor and the nature of the testimony, that Ortiz's
11 explanation was credible.

12      Both Pintane and Ortiz also testified that Ortiz dropped his hands two to three times, but that
13 Ortiz complied each time with Pintane's order to raise his hands. There is no dispute that Ortiz
14 lowered his hands just after Ortiz handed the paperwork to Pintane. UPD Rpt. at 3; Ortiz Decl. ¶ 6.
15 Both agree that Ortiz once used his hands to receive a call on his cell phone, and Pintane does not
16 dispute that Ortiz lowered his hands a second time after hanging up to wipe them on his lap. Ortiz
17 may have had a cigarette in his hand. The record does not reflect that Ortiz dropped his hands in any
18 furtive manner. Thus, Ortiz's non-compliance was fleeting and innocuous.

19      Further, "[t]he fact that an officer had already completed a large portion of his investigation
20 of the vehicle without facing any threatening behavior undermines the 'well-settled . . . purpose of a
21 *Terry* stop . . . to allow the officer to pursue his investigation without fear of violence.'" *I.E.V.*, 705
22 F.3d at 438 (quoting *United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir. 2001)). Pintane had
23 completed his inquires and tasks related to Ortiz's traffic violation without facing threatening
24 behavior or any apparent fear that Ortiz was armed and dangerous. The undisputed evidence was
25 that Ortiz was friendly and complied with Pintane's orders. Furthermore, the records check on Ortiz
26 came back clear.

27      The question is made close, however, by Pintane's testimony that Ortiz stated "there might
28 be bullets" in the vehicle. If credited, this might provide reasonable suspicion that Ortiz was armed

13

and dangerous. Although Ortiz disputes in the motion that he mentioned bullets, no testimony on this point was elicited. However, the Court finds Pintane's testimony not particularly credible. For the same reason the Court does not find Ortiz gave consent to the search, it finds it unlikely that he volunteered to Pintane, "[t]here might be bullets" in the truck.

### ii.     The Frisk Exceeded *Terry*'s Scope

In any event, even if Pintane's testimony is credited and he had reasonable suspicion that Ortiz was armed and dangerous, he exceeded the scope of a permissible *Terry* frisk by lifting Ortiz's shirt. 392 U.S. at 27. A *Terry* frisk must be "confined in scope to an intrusion reasonably designed to discover" hidden weapons. *Terry*, 392 U.S. at 29. An officer should begin a *Terry* search by "pat[ting] down a suspect's outer clothing and feel[ing for] an object whose contour or mass makes its identity immediately apparent." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). A search exceeds the proper scope if "the incriminating character of [an item is] not immediately apparent" but is discovered "only as a result of a further search." *Id.* at 379. Accordingly, to legitimize a search underneath a suspect's clothing, an officer must reasonably believe, based on the frisk, that weapons could still be present. *See, e.g.*, *I.E.V.*, 705 F.3d at 440-41; *United States v. Miles*, 247 F.3d 1009, 1014 (9th Cir. 2001) (emphasizing that *Dickerson*'s "immediately apparent" rule applies once the officer reasonably determines that he has not felt a weapon).

In *I.E.V.*, an officer lifted a defendant's shirt to reveal marijuana after feeling a brick-shaped object during a frisk. 705 F.3d at 434. That officer did not testify to what he felt during the frisk before lifting the defendant's shirt. *Id.* The court held, "because it is not obvious from the record that the officer immediately identified the bundle on the Defendant as contraband or a weapon, the search of the Defendant exceeded the scope of a constitutional *Terry* search." *Id.* at 441-42. Thus, the officer had exceeded *Terry*'s scope by lifting the defendant's shirt. *Id.* Thus, *I.E.V.* implies that to justify a more intrusive search, the initial frisk must yield something to warrant a further intrusion.

Pintane did not identify anything in his initial frisk, let alone something that he could identify as contraband or a weapon. Pintane's testimony that he could not be sure there was no weapon because Ortiz's shirt was "baggy" is not credible. The evidence at the hearing showed the shirt was

made of a thin cotton-like material that was not particularly "baggy." While certain clothing, such as a "long winter coat" might conceal a weapon, *see, e.g.*, *United States v. Douglas*, 964 F.2d 738, 741 (8th Cir. 1992), Ortiz's tee shirt was not such an article.

The Government has submitted a supplemental brief to support its contention that lifting Ortiz's shirt was "frankly, less intrusive than" a frisk and within *Terry*'s constitutional bounds. Docket No. 30; Response at 9:1. The brief presents two authorities, *United States v. Hill*, 545 F.2d 1191 (9th Cir. 1976) and *United States v. Edmonds*, 948 F. Supp. 562 (E.D. Va. 1996). Neither is apposite.

The facts in *Hill* differ from those here in key respects. There, the officer encountered the defendant close to the scene of an armed bank robbery and within a short time of its commission. *Hill*, 545 F.2d at 1193. The officer testified that "while conversing with the [defendant] he noticed a large bulge at [defendant]'s waistband *which he suspected of being caused by a weapon*." *Id.* at 1192 (emphasis added). The officer then raised the defendant's shirt, "exposing his waistband and revealing four to six rolls of currency." *Id.* at 1192-93. Here, in contrast, nothing Pintane saw or felt could have led to a suspicion that Ortiz was concealing a weapon, since Pintane did not see or feel anything.

*Hill* did state, "Terry does not in terms limit a weapons search to a so-called 'pat down' search. . . . The raising of the shirt in the instant case is well within the boundaries established by Terry." *Id.* at 1193. On its face, this may appear to support the Government's position. However, the Ninth Circuit has since made clear in *I.E.V.* that lifting a suspect's shirt exceeds *Terry*'s constitutional scope unless the officer previously identified (and testified to) what he suspected to be a weapon or contraband.[6]

The second case, *Edmonds*, on which the Government relies is not persuasive. First, the case is from the Eastern District of Virginia (and affirmed in an unpublished Fourth Circuit opinion), and therefore not binding on this Court. Second, while the court held that it was permissible for the officer to lift the suspect's shirt despite not detecting anything underneath, in all of the Circuit Court

---

[6] Query whether *Hill*'s observation would have been maintained by the court had the detainee been female and asked to lift her blouse.

1 opinions on which it relied, the officer either observed or felt beforehand an object underneath the
2 suspect's clothing which warranted searching beneath the outer clothing.  *See, e.g.*, *Hill*,  545 F.2d at
3 1192; *United States v. Douglas*, 964 F.2d 738, 740 (8th Cir. 1992); *United States v. Buchannon*, 878
4 F.2d 1065, 1066 (8th Cir. 1989).

5 Thus, even if the Court were to assume Pintane had reasonable suspicion to prolong the stop
6 and reasonable suspicion to conduct a *Terry* frisk, Pintane exceeded *Terry*'s permissible scope by
7 lifting Ortiz's shirt despite not feeling anything during the frisk.  Because the baggie was found as a
8 result of a Fourth Amendment violation, the Court grants Ortiz's motion to suppress this evidence.
9 Since the baggie provided probable cause to search the vehicle, the evidence found in the vehicle
10 was fruit of the *Terry* frisk.  The Government concedes this.  As fruit of a poisonous tree, the baggie
11 and evidence found in the truck must be excluded.

## III.  CONCLUSION

As the Court finds that Ortiz did not consent to the search of his vehicle and all the evidence was otherwise obtained as a result of an unconstitutional *Terry* frisk, the Court **GRANTS** Defendant's Motion to Suppress.

This order disposes of Docket Nos. 12 and 26.

As previously scheduled, a further status conference is set for 2:30 p.m. on August 27, 2014.

IT IS SO ORDERED.

Dated: August 19, 2014

_____
EDWARD M. CHEN
United States District Judge